IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

GTP STRUCTURES I, LLC,

    Plaintiff,

v.           No. 14-1317

WISPER II, LLC,

    Defendant.

ORDER GRANTING IN PART THE
PARTIES' CROSS-MOTIONS FOR
SUMMARY JUDGMENT

*INTRODUCTION*

Plaintiff, GTP Structures I, LLC ("GTP"), brought this action on November 25, 2014, pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332, against Defendant, Wisper II, LLC ("Wisper II"), alleging claims for breach of contract, unjust enrichment, and mandatory injunctive relief.[1] (Docket Entry ("D.E.") 1.) Before the Court are the parties' cross-motions for summary judgment. (D.E. 53; D.E. 56.)

*STANDARD OF REVIEW*

Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all evidence in the light most favorable to the nonmoving party and

---

[1] On June 24, 2015, as discussed *infra*, Defendant removed its remaining equipment from the cell towers, rendering moot Plaintiff's request for mandatory injunctive relief compelling Wisper II to surrender possession and remove its equipment.

1

draw all justifiable inferences in the nonmoving party's favor. *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015). "There is a genuine issue of material fact only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The test is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* The moving party must initially show the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). It is then incumbent upon the nonmoving party to "present significant probative evidence to do more than show that there is some metaphysical doubt as to the material facts to defeat the motion." *Id.* The court may not make credibility determinations or weigh evidence as these are functions of the jury rather than the judge. *Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 644 (6th Cir. 2015). Cross-motions for summary judgment are analyzed under the same standard. *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 335 (6th Cir. 2010). Each motion is evaluated on its own merits. *Id.* A party may move for partial summary judgment identifying the part of each claim on which summary judgment is sought. *See* Fed. R. Civ. P. 56(a).

If the movant "also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001); *accord Hantz Fin. Servs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, No 13-cv-11197, 2015 WL 5460632, at *2 (E.D. Mich. Sept. 17, 2015). "[S]ummary judgment in favor of the party with the burden of persuasion is inappropriate when the evidence is susceptible to different interpretations or inferences by the trier of fact." *Cockrel*, 270 F.3d at 1056; *see also*

*Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). "Plaintiff['s] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for plaintiffs." *Hantz Fin. Servs*, 2015 WL 5460632, at *2. "If the defendant[] respond[s] to the motion with controverting evidence which demonstrates a genuine issue of material fact, [the plaintiff's] motion must be denied." *Kassouf v. U.S. Liability Co.*, No. 1:14CV2656, 2015 WL 5542530, at *3 (N.D. Ohio Sept. 18, 2015).

*FACTS*

Wisper was a Tennessee limited liability company that provided wireless internet access services through equipment installed on wireless cell towers. (D.E. 1 at ¶ 6.). It leased the space for its equipment on the cell towers from NTCH-West Tenn, Inc. ("NTCH"), through two Master Lease Agreements ("MLAs"), on July 13, 2012. (*Id.* at ¶ 7.) The MLAs had identical terms and governed specific sets of site lease agreements and associated Site Lease Agreements (collectively, the "SLAs"). (*Id.*) All of the SLAs had identical terms except to identify the specific tower on which NTCH leased the space to Wisper. (*Id.* at ¶ 8.) NTCH and Global Tower Properties, LLC ("Global Tower"), entered into an Asset Purchase Agreement ("APA"), under which Global Tower purchased all of NTCH's rights, title, and interest in and to real and personal assets, properties, and rights, including NTCH's rights under the MLAs and SLAs. (*Id.* at ¶ 9.) Global Tower then subsequently assigned its interests under the APA to Plaintiff. (*Id.*)

The MLAs are for twenty-five-year terms, and the "Initial Term" of each SLA is for five years. (*Id.* at ¶ 11.) Unless the SLA is properly terminated at the end of the first five year term, it is automatically extended for another four additional five year terms ("Extension Terms"). (*Id.*) The "Initial Term" and any "Extension Terms" are collectively referred to as the "Term." (*Id.*) Pursuant to the MLAs, the monthly rent ("Rent") for each SLA started at "$1,000 as

outlined in each particular SLA" and was to be paid in monthly installments during the Term." (*Id.* at ¶ 12.) Both the MLAs and the SLAs provide that "the Rent for each month shall be 103% of the monthly Rent for the immediately preceding year commencing on the annual anniversary" of the particular SLA beginning date. (*Id.*)

The MLAs provide that failure to pay rent, after notice and lapse of a fifteen day cure period with no cure, constitutes default. (*Id.* at ¶ 13.) The party to whom rent is due then

> may pursue all rights and remedies permitted by applicable law, including but not limited to the following:
>
> (i) . . . declare to be immediately due and payable, . . . a sum equal to (y) all Rent . . . due . . . and in arrears at the time of default, plus (z) the Rent reserved for the then entire unexpired balance of the term of the SLA (taken without regard to early termination of the Term), . . . up to the end of such Term . . .; and/or
>
> (ii) . . . terminate the SLA . . . [whereupon, the party in default shall] quit and surrender possession of the Premises to Lessor . . . .

(*Id.*)

On March 27, 2013, Wisper filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Tennessee. (*Id.* at ¶ 15.) It remained in possession of its assets as Debtor in Possession and kept its equipment installed on the wireless cell towers that were the subject of the MLAs and SLAs. (*Id.* at ¶ 16.) Pursuant to a Plan of Reorganization (the "Plan") confirmed by the bankruptcy court, Wisper was merged into Wisper II, with Wisper II—Defendant in the instant matter—as the surviving entity. (*Id.* at ¶ 17.) Following the Plan and a consent order for the assumption and assignment of unexpired lease agreements ("Consent Order"), the unexpired MLAs and forty-nine of the associated SLAs were assumed and assigned to Wisper II. (*Id.* at ¶¶ 18-19.) Accordingly, Wisper II became responsible for all obligations and liability for performance under the MLAs and associated SLAs. (*Id.* at ¶ 20.)

Wisper II continued to provide wireless internet service to its customers through its equipment located on the wireless cell towers but beginning in May of 2014, ceased to pay GTP the rent owed. (*Id.* at ¶ 21.) Ruth Dowling, GTP's legal counsel, contracted Tom Farrell, Wisper II's General Manager, in June of 2014 to inform Farrell of the default and to seek information on when or if rent would be paid. (D.E. 53-13.) Over the subsequent months, Farrell and Dowling continued to communicate about the default and potential lease renegotiations involving NTCH. (*See* D.E. 53-14; D.E 53-15.) GTP had yet to receive any of the outstanding rent when it filed suit on November 25, 2014. (D.E. 1 at ¶ 23.)

On March 18, 2015, Wisper II filed a motion for a preliminary injunction to enjoin GTP "from taking any action to disable, disconnect and/or remove or dispose of Wisper II's Communication Facility on or from any of the remaining thirty seven (37) Tower sites" where its equipment remained. (D.E. 21 at 4.) On March 24, Defendant sought to withdraw its motion following a mutual agreement of the parties. (D.E. 25.) The motion was then terminated. On June 24, 2015, Wisper II's remaining equipment on the cell towers were removed, and it made a one-time payment of $140,968.20 to GTP. (D.E. 53-2 at 6.)

*THE PARTIES' MOTIONS*

Plaintiff submits in its motion and supporting memoranda of law that: (1) it substantially complied with the contractual condition precedent to maintaining an action for default, and (2) it made reasonable efforts to mitigate the damage caused by Defendant's breach. (D.E. 53-2; D.E. 60.) Defendant contends that: (1) Plaintiff failed to comply with the condition precedent before filing suit—specifically that its method of giving notice of the default and the notice itself were inadequate, (2) there is a disputed issue of material fact as to whether Plaintiff engaged in

5

sufficient mitigation efforts to offset its damages, and (3) there exists a disputed issue of material fact as to whether Defendant's liability is capped at $300,000. (D.E. 58.)

*ANALYSIS*

Choice of Law

In a diversity action, state substantive law governs. *Performance Contracting, Inc. v. Dynasteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014). This Court must also apply the choice-of-law rules of Tennessee. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Tennessee courts "will honor a choice of law clause if the state whose law is chosen bears a reasonable relation to the transaction and absent a violation of the forum state's public policy." *Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton*, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012). Here, the MLAs contain choice of law clauses stating that Florida law is applicable to the governance, interpretation, construction, and regulations of the performances pursuant to the contracts. (D.E. 53-4 at 7; D.E. 53-5 at 7.) Plaintiff is a Florida company and both parties rely exclusively upon Florida law in their memoranda of law. (*See* D.E. 53-2, 56-1, 58, 61.) The Court finds that there is a reasonable relationship between the transactions and the State of Florida such that a Florida court would honor the choice-of-law clauses and apply its own substantive law.

Breach of Contract

When a party claims a breach of contract, state law applies. *See Simoneau v. Gen. Motors Corp.*, 85 F. App'x 445, 447 (6th Cir. 2003) (claim for breach of contractual rights is a state-law claim). As established *supra*, Florida law governs in this case. "In order to prevail in a cause of action for breach of contract, evidence must be presented that establishes: 1) a valid contract; 2) a material breach of the contract; and 3) damages." *Burlington & Rockenbach, P.A.*

*v. Law Office of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. Dis. Ct. App. 2015). A material breach is the failure to "perform a duty that goes to the essence of the contract and is of such significance that it relieves the injured party from further performance of its contractual duties." *Id.* Florida courts recognize the theory of substantial performance to satisfy the conditions of a contract. "Substantial compliance or performance is that performance of a contract which, while not full performance, is so nearly equivalent to what was bargained for that it would be unreasonable to deny the other party the benefit of the bargain." *Green Tree Servicing, LLC v. Milam*, No. 2D14-660, 2015 WL 454200, at *5 (Fla. Dis. Ct. App. July 29, 2015). A party's adherence to "contractual conditions precedent is evaluated for substantial compliance or substantial performance." *Id.* at *4; *see Alvarez v. Rendon*, 953 So.2d 702, 708 (Fla. Dis. Ct. App. 2007) ("[T]here must be at least substantial performance of conditions precedent in order to authorize a recovery as for performance of a contract."); *Grover v. Jacksonville Golfair, Inc.*, 914 So.2d 995, 996 (Fla. Dis. Ct. App. 2005) (affirming judgment on option agreement where "there was substantial performance of [the] conditions precedent" (alteration in the original)). "A condition precedent has been defined as one which calls for the performance of some act, or the happening of some event after a contract is entered into, upon the performance or happening of which its obligation to perform is made to depend." *Alvarez*, 953 So. 2d at 708.

In *Green Tree Servicing, LLC*, the lender sought to foreclose a mortgage for the failure of the mortgagors to pay. 2015 WL 4549200, at *3. A condition precedent to maintaining a foreclosure suit was the notice requirement found within the mortgage agreement. *Id.* The contractual requirement contained five pieces of information to be included: (1) the default, (2) the action required to cure, (3) a date thirty days after which the default was required to be cured, (4) that failure to cure may result in acceleration and foreclosure, and (5) the mortgagors' rights

to reinstatement and available defenses. *Id.* The lender mailed notice to the mortgagors containing all of the required information. *Id.* The case turned on whether the letter sufficiently discussed each of these. *Id.* At no point did the mortgagors claim the letter caused them to suffer any harm as a result of any alleged deficiency in the notice letter. *Id.* The trial court granted summary judgment for the mortgagors after finding the notice letter failed to sufficiently apprise them of their rights to reinstatement and available defenses. *Id.* at 3. The appellate court reversed, finding that the notice did address all five items, and although the language was not exact, the letter "did substantially comply." *Id.* at *7. The court explained that "when the content of a lender's notice letter is nearly equivalent to or varies in only immaterial respects from what the [contract] requires, the letter substantially complies." *Id.* at *5. However, the court noted, "[w]here . . . the lender's notice letter varies . . . in a way that goes to the essence of the parties' bargain, the variation is material and the lender has failed to satisfy a condition precedent to the . . . action." *Id.* The court emphasized that the notice provision in the contract was

> designed to ensure that a borrower receives essential information concerning his or her default, how to cure it, and his or her rights with respect to it. It is not a technical trap designed to forestall a lender from prosecuting an otherwise proper . . . action because a borrower, after the fact, decides that the letter might have been better worded.

*Id.* at *10.

Moreover, Florida courts have noted that "[a]bsent some prejudice, the breach of a condition precedent does not constitute a defense to the enforcement of an otherwise valid contract." *Gorel v. Bank of New York Mellon*, 165 So. 3d 44, 48 (Fla. Dist. Ct. App. 2015); *see Allstate Floridian Ins. Co. v. Farmer*, 104 So. 3d 1242, 1248-49 (Fla. Dist. Ct. App. 2012) (holding breach of condition precedent must be material—one causing prejudice—to constitute defense to enforcement of contract). In *Gorel*, the mortgagor argued that the lender failed to

8

provide sufficient evidence that it complied with the contract's requirements for default notice because it "did not specify a date not less than thirty days from the date the notice was given . . . by which the default must be cured." *Gorel*, 165 So. 3d at 47. While the default notice did in fact specify a cure date that was not in compliance, the court found that "the defective notice did not prejudice" the mortgagor. *Id.* The court noted that the mortgagor "made no attempt to cure," and, thus, he suffered no prejudice from the faulty notice.[2] *Id.* Without a showing of prejudice, the mortgagor could not present the alleged breach as a defense to the enforcement of the otherwise valid contract. *Id.*

In the instant matter, paragraph 22(a) of the MLA governs the contract's requirements for default notice. (D.E. 53-4.) It states the following:

> In the event there is a default by the LESSEE with respect to any provisions of this Agreement of any SLA under it, including the payment of rent, the LESSOR shall give LESSEE written notice of such default. After receipt of such written notice, LESSEE shall have fifteen (15) days in which to cure any monetary default . . . . The LESSOR may not maintain an action or effect any remedies for default against the LESSEE unless and until the LESSEE has failed to cure the same within the time periods provided in this Section.

(*Id.* at 8.) Paragraph 21 provides:

> All notices hereunder must be in writing and shall be deemed validly given if sent by certified mail, return receipt requested or by commercial order, provided the courier's regular business is delivery service and provided further that it guarantees delivery to the addressee by the end of the next business day following the courier's receipt from the sender . . . .

(*Id.* at 7.)

---

[2]Similarly, in *Vasilevskiy v. Wachovia Bank, Nat'l Assn.*, 171 So. 3d 192, 192 (Fla. Dist. Ct. App. 2015), the lender sent the mortgagor a default notice with a defective cure date. The lender, however, waited four months after providing notice of default before filing suit, although only thirty days were required to be given for an opportunity to cure. *Id.* The lessee failed to cure during this time, and as such, the court found that the breach of the condition precedent was not material. *Id.*

9

It is undisputed that Wisper II is, in fact, in breach of the existing leases; Defendant has acknowledged upon multiple occasions that it failed to pay the required rent and did not cure the default. (*See* D.E. 53-8; D.E. 53-13; D.E. 53-14; D.E. 53-15; D.E. 53-16.) It is also not contested that Defendant had actual notice of its default. On June 26, 2014, Dowling emailed Farrell, stating that "Wisper ha[d] failed to make its required payments to [GTP] in May and June," and asking when it could expect to see the rent paid. (D.E. 53-13.) Farrell responded that he was hoping to restructure the existing leasing agreement with GTP and NTCH but did not note that Wisper II had any expectation to pay what they currently owed. (*Id.*) Dowling replied that GTP was seeking full payment and requested to be advised whether the payments would be made. (*Id.*) In October of 2014, Farrell and Dowling again discussed the fact that Wisper II was in default. (D.E. 53-14.) Farrell emailed Dowling stating, "Wisper II is not denying that it owes [GTP] rent" and although Defendant "had made improvements in its revenue and expenses," these improvements were "still not enough." (*Id.*) Dowling then responded on October 3, 2014, that GTP "want[ed] to be paid on the contracts," and that she would "need to bring a default action soon if Wisper II d[id] not catch up on the outstanding payments." (*Id.*) On October 17, Farrell sent another email to Dowling explaining that Wisper II was expanding its consumer base in hopes that would help her "position." (D.E. 53-15.) It is unclear if the "position" he was referring to concerned contract negotiations or referenced her October 3 statement about bringing a default action. Dowling responded the same day, explaining she was "waiting for a proposal from Wisper II and NTCH but fast running out of time before [she] need[ed] to move forward with a breach of contract action." She emphasized that no payment had been received "for four months." (*Id.*) Farrell replied that "[t]here [was] no action [she could] take that [would] result in

10

any money from Wisper II, LLC or even a portion of it unless [she] entertain[ed] the proposal already put forth." (*Id.*)

Defendant contends that GTP's failure to send written notice "by either certified mail return[,] receipt requested[,] or by commercial courier with next business day delivery" breached the condition precedent for pursuing a lawsuit for default. (D.E. 61 at 1.) Further, Defendant alleges that Plaintiff failed to comply with the condition precedent by not specifying that Wisper II was entitled to a fifteen day cure period for its monetary default. (*Id.* at 3.) Plaintiff does not deny that it failed to send notice of default via certified mail or by commercial courier, but instead asserts that the email correspondences between the agents of both parties regarding the default constituted substantial adherence with the notice requirements, making the breach not material. (D.E. 60 at 1, 2.)

Comparing the instant matter to *Green Tree Servicing, Inc.*, GTP argues its failure to comply with the contractual condition precedent was a technical deficiency and "was not substantive, was of no practical consequence, and cannot have prejudiced Wisper II." (*Id.* at 2.) Defendant attempts to distinguish *Green Tree Servicing, LLC*, relying on the fact that in that case, a written notice of default was actually mailed and that the cure period had begun. (D.E. 61 at 8.) Further, it argues, that the mortgagors in *Green Tree Servicing, LLC* were not prejudiced by the notice's deficiency, but that harm does exist in the instant matter. (*Id.*) However, the contract in *Green Tree Servicing, LLC* differs from the one in this case. In *Green Tree Servicing, LLC*, the contract specified that the notice of default "shall specify: . . . (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured." *Green Tree Servicing, LLC*, 2015 WL 4549200, at *1. In the instant matter, the contract only requires that "the LESSOR shall give LESSEE written notice of . . . default. After receipt of

such written notice, LESSEE shall have fifteen (15) days in which to cure any monetary default." (D.E.53-4 at 8.) The contract then states that "[t]he LESSOR may not maintain an action or effect any remedies for default against the LESSEE unless and until the LESSEE has failed to cure the same within the time periods provided in this Section." (*Id.*) The condition precedent in this case is satisfied upon proper notice of default and then Plaintiff waiting at least fifteen days before maintaining an action. The contract does not require GTP to include in its default notice the amount of time Defendant had to cure; it merely requires that Plaintiff refrain from filing suit for at least fifteen days.

Wisper II also argues that this matter is analogous to *Ramos v. Citimortgage, Inc.*, 146 So. 3d 126 (Fla. Dist. Ct. App. 2014), and *Samaroo v. Wells Fargo Bank*, 137 So. 3d 1127 (Fla. Dist. Ct. App. 2014). Both cases, however, are distinguishable. In *Ramos*, "there was no record evidence that the [mortgagors] had actually received the default notice." *Ramos*, 146 So. 3d at 129. Although there was a notice of default mailed, it was to an address that was not provided by the mortgagors, and the lender did not present "summary judgment evidence . . . to conclusively disprove" the allegation that the mortgagors never received notice. *Id.* Here, it is undisputed Defendant had notice of its default; it acknowledged its repeated failure to pay months of rent. The issue here is whether GTP's conveyance of the notice of default could be considered substantial performance under the contract. Thus, *Ramos* is not on point. In *Samaroo*, part of the condition precedent before filing a lawsuit for default was to inform the mortgagors—in the notice of default—of the "right to reinstate after the acceleration" of payment. *Samaroo*, 137 So. 3d at 1128. The court found that the default notice provided to the mortgagors neither informed them of this right nor even suggested it. *Id.* Further, the court noted, the failure to include mandatory information precluded the lender from asserting that it

12

substantially complied with the notice requirements. *Id.* Here, the only information that was required to be given to Defendant was notice of default, which occurred. Plaintiff's failure was in not complying with the method of delivering notice.

Under the terms of the contract, GTP had to meet two conditions before maintaining an action for default: 1) send a notice of default to Defendant, in writing, via certified mail or commercial order, and 2) provide Defendant a fifteen day period to cure its default. (D.E. 53-4 at 7-8.) Dowling, on behalf of GTP, first contacted Farrell on June 26, 2014, about Defendant's failure to pay rent for both May and June. (D.E. 53-13.) The two agents continued to communicate about the issue of default over the upcoming months, and, although Defendant was aware of its default, it made no attempt to cure. (*See* D.E. 53-13; D.E. 53-14; D.E. 53-15.) It is undisputed that Defendant was in default and was aware of it. Although Plaintiff failed to send its written notice of default pursuant to the terms of the contract, it substantially complied with the requirements. GTP provided written notice of the default, albeit in an email, specifically noted the months that were in default, and waited significantly longer than fifteen days to file its lawsuit. GTP warned Defendant that if it did not "catch up on the outstanding payments," it would bring a default action. (D.E. 53-14.) The notice provision in the contract was designed to ensure that Defendant would receive the essential information concerning its default. "It is not a technical trap designed to forestall a lender from prosecuting an otherwise proper . . . action." *Green Tree Servicing, LLC*, 2015 WL 4549200, at * 10. Finding that Plaintiff did not substantially comply with the contractual notice requirements would be precisely the type of "technical trap" the Florida appellate court warned against in *Green Tree Servicing, LLC*.

Even assuming, arguendo, that Plaintiff breached the condition precedent, Defendant has failed to demonstrate prejudice resulting therefrom. *See Gorel*, 165 So. 3d at 48. GTP did not

file its lawsuit until November 25, 2014.  (D.E. 1.)  The first email correspondence regarding the issue of default was on June 26, 2014.  (D.E. 53-13.)  While Wisper II does not dispute that it had knowledge of the default, it claims that Plaintiff's failure to specify the fifteen-day cure period caused prejudiced by depriving "it of its opportunity to determine if it could cure."  (D.E. 61 at 7.)  Defendant's argument, however, is weakened by Farrell's assertion to Dowling that "[t]here is no action [GPT] can take that [would] result in any money from Wisper II, LLC or even a portion of it unless [GPT] entertain[s] the proposal already put forth."  (D.E. 53-15.)  Moreover, even after Dowling repeatedly informed Farrell that GPT was planning on pursuing a lawsuit if Wisper II failed to pay its outstanding rent, at no point did Defendant make any attempt to cure.  Similar to *Gorel*, Defendant has not established prejudice as it did not endeavor to even partially resolve its default.  *See Gorel*, 165 So. 3d at 48.  Thus, there are no genuine issues of material fact concerning the notice of default given to Defendant.  As Plaintiff substantially complied with the contractual notice requirement, it is entitled to summary judgment on this issue.

<u>Unjust Enrichment</u>

Plaintiff also seeks damages under a theory of unjust enrichment.  (D.E. 1 at ¶¶ 30-33.)  It is well-established under Florida law that the existence of an express contract precludes a claim for unjust enrichment that arises out of the contractual relationship.  *See Moynet v. Courtois*, 8 So. 3d 377, 379 (Fla. Dist. Ct. App. 2009), *disapproved of on other grounds by Bank of New York Mellon v. Condo. Ass'n of La Mer Estates, Inc.*, 175 So. 3d 282 (Fla. 2015) ("With regard to the count for unjust enrichment, where there is an express contract between the parties, claims arising out of that contractual relationship will not support a claim for unjust enrichment."); *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. Dist. Ct. App. 2008)

14

("Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.); *Ocean Commc'ns, Inc. v. Bubeck*, 956 So. 2d 1222, 1225 (Fla. Dist. Ct. App. 2007) ("Defendants correctly state that a plaintiff cannot pursue an equitable theory, such as unjust enrichment or quantum meruit, to prove entitlement to relief if an express contract exists.") As such, Defendant's motion for summary judgment on Plaintiff's claim for unjust enrichment is GRANTED.

## Defendant's Claim of Capped Damages

Defendant asserts that there is a "disputed issue of material fact as to whether Wisper II's liability is capped at $300,000.00." (D.E. 58 at 12.) This argument is premised on the exhibit attached to "[t]he Creditor/Investor Plan Proponent's Plan of Reorganization" ("Plan"), which was later confirmed as the Plan of Reorganization by the bankruptcy court. (D.E. 53-9; D.E. 53-10.) In the Plan, it was agreed that "the Reorganized Debtor will assume each of the other Executory Contracts and Unexpired Leases listed on Exhibit B." (D.E. 53-9 at 11.) Exhibit B, entitled "Executory Contracts and Unexpired Leases to Be Assumed or Assigned," listed the following: "Lease: GTP Structures I, LLC"; "Amount: $300,000.00"; "Payment: Monthly lease payments of $50,470 will commence upon the effective date of the Plan." (*Id.* at 17.) Although the Plan did not specifically state what the "$300,000.00" referenced, it did contain a section explaining the details for payments relating to the assumption of executory contracts and unexpired leases:

> To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Reorganized Debtor assuming such contract or lease or the assignee of such Reorganized Debtor, if any: (a) by payment of the Cure Amount Claim in Cash on the Effective Date; or (b) on such other terms as agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim; (b) the ability of the applicable Reorganized Debtor or any assignee to

15

provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to the assumption or assumption and assignment of such contract or lease, the payment of any Cure Amount Claim required by section 265(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

(*Id.* at 12.)

The Plan of Reorganization was confirmed by court order on January 29, 2014. (D.E. 53-10 at 2.) On February 18, 2014, the bankruptcy court issued a consent order for the assumption and assignment of unexpired lease agreements. (*Id.*) In the order, the court highlighted that the parties—GPT and the Debtor—stipulated and agreed to the following:

> . . . certain executory contracts and unexpired leases, including the unexpired leased between GTP and the Debtor, will be assumed and assigned to the Reorganized Debtor, Wisper II, LLC. The unexpired leases assumed and assigned to the Reorganized Debtor are those certain two Master Lease Agreements ("Master Leases"), each dated July 13, 2012, and 49 associated Site Lease Agreements ("Site Leases"), all between GTP as lessor and Wisper, LLC as lessee. . . . The Debtor is currently in default under the terms of the Leases. As provided in the Plan of Reorganization, the Reorganized Debtor shall cure the existing defaults under the Leases. Cure costs, as required pursuant to Section 365(b)(1)(A) of the Bankruptcy Code and the Plan of Reorganization, shall be paid on the Effective Date of the Plan of Reorganization as confirmed, in the amount of $552,170.00
> . . . .

(*Id.* at 3-5.) Although Defendant contends its potential liability is capped at $300,000.00, the consent order issued by the bankruptcy court undermines this argument. The order itself stated that Defendant already owed GTP $552,170.00 in cure costs for its outstanding default. (*Id.* at 5.)

Further, the only way that Defendant's future liability would be limited is if it assumed the existing executory contracts in part rather than in their entirety. Defendant provides no basis for this Court to find that it only partially assumed the executory contracts. Indeed, the law is well established that executory contracts assumed in bankruptcy must be taken in their entirety. *See Cinicola v. Scharffenberger*, 248 F.3d 110, 119-20 (3d Cir. 2001) ("Section 365 of the

16

Bankruptcy Code authorizes the trustee to assume or reject executory contracts, enabling the trustee to maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not. . . . If the trustee meets the assumption requirements under § 365, it must assume the executory contract entirely."); *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("A non-debtor is further protected by the requirement that an executory contract may not be assumed in part and rejected in part. Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere*—the debtor accepts both the obligations and the benefits of the executory contract.); *In re Plum Run Serv. Corp.*, 159 B.R. 496, 498 (Bankr. S.D. Ohio 1993) ("an executory contract must be assumed or rejected by the Debtor in its entirety, and cannot be dealt with in a piecemeal fashion"); *see also In re Airlift Int'l, Inc.*, 761 F.2d 1503, 1508 (11th Cir. 1985) ("In the typical Chapter 11 case the trustee must assume or reject an executory contract or unexpired lease before confirmation of a plan . . . . Upon assuming an executory contract or unexpired lease under section 365 the estate must (i) cure all defaults, (ii) compensate the other party for any pecuniary losses arising from such default, and (iii) provide adequate assurance of future performance under the agreement. Moreover, the estate becomes liable for performance of the entire contract, as if bankruptcy had never intervened.")

Defendant has provided no legal authority supporting its contention that it assumed the executory contracts with GPT in part rather than in whole. Additionally, the claim that its liability is capped at $300.000.00 is contradicted by the bankruptcy court's consent order that Defendant must pay $552,170.00 in cure costs. As such, the Court finds that Wisper II's liability is not capped.

Mitigation and Damages

"The rule of damages applicable in a breach of contract action is loss of profit, which may be . . . measured by deducting from the balance of the contract price the costs of completing performance of the contract." *Graphic Assocs., Inc. v. Riviana Rest. Corp.*, 461 So. 2d 1011, 1014 (Fla. Dist. Ct. App. 1984). The Florida Supreme Court recently expounded upon the issue of mitigation in *System Components Corp. v. Florida Dep't of Transportation*, 14 So. 3d 967, 982 (Fla. 2009), where it explained that "[t]he doctrine of avoidable consequences, which is also somewhat inaccurately identified as the duty to mitigate damages, commonly applies in contract and tort actions." The court held that "no actual duty to mitigate" exists "because the injured party is not compelled to undertake any ameliorative efforts." *Id.* The doctrine merely "prevents a party from recovering those damages inflicted by a wrongdoer that the injury party *could have* reasonably avoided." *Id.* Reduction in damages is not permitted if it would be based upon "what could have been avoided through Herculean efforts." *Id.* Rather, the court noted, "the injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through 'ordinary and reasonable' care, without requiring undue effort or expense." *Id.* (quoting *Graphic Assocs., Inc.*, 461 So. 2d at 1014). Non-exclusive contracts, however, are "generally considered as exception to the requirement of avoiding unforeseeable consequences." *Graphic Assocs., Inc.*, 461 So. 2d at 1014. A party who is able to enter into similar contracts alongside an existing contract is considered to be in a non-exclusive contract and has "no duty to minimize . . . losses." *Gary Massey Chevrolet, Inc. v. Ritch*, 507 So. 2d 713, 715 (Fla. Dist. Ct. App. 1987); *see Burger King Corp. v. Hinton, Inc.*¸ 203 F. Supp. 2d 1357, 1365 (S.D. Fla. 2002) ("[U]nder Florida law a franchisor does not have an obligation to minimize losses or mitigate damages, as a franchise agreement is a non-exclusive contract.").

The contract between GTP and Wisper II is non-exclusive. While Plaintiff was leasing space in the cell towers to Defendant, each of the towers rented could hold up to "five tenants," and none of them were at maximum occupancy, nor are they currently. (D.E. 53-2 at 6-7.) Thus, GTP could have performed its contract with Wisper II "in addition" to other contracts of the same type. *See Graphic Assocs., Inc.*, 461 So. 2d at 1014 ("A purchaser [at a car dealership] who breaches his contract to buy an automobile is not entitled to credit against claimed damages for other sales of automobiles made by the dealer" because it is a non-exclusive contract.) As it is a non-exclusive contract, Plaintiff was not required to mitigate its damages upon Defendant's breach. Despite not having a duty to minimize its losses, however, GTP still made reasonable, ameliorative efforts to replace Wisper II as a tenant. (D.E. 53-2 at 6-7.) "The [t]owers were marketed through an online site locator tool, webinars, industry conferences, email circulars, and national and regional sales teams." (*Id.*)

Defendant does not dispute any of these efforts but merely offers one marketing list that did not include the particular cell towers at issue. (D.E. 58 at 12.) Plaintiff concedes that this is correct but explained that the towers on that particular list "were only those subject to a special promotion," which did not include the towers Defendant had been using. (D.E. 60 at 9.) Even taking into account the one list Defendant cites, it has not demonstrated how the additional steps taken by Plaintiff fell short of the mitigation standard of employing "ordinary and reasonable care, without requiring undue effort or expense." *See Sys. Components Corp.*, 14 So. 3d at 982. As such, the Court finds there is no issue of material fact regarding Plaintiff's mitigation efforts.

Pursuant to the MLA, in the event of a default, GTP had the right to

> declare to be immediately due and payable, without regard to any early termination of such term on account of a default or other right to terminate the SLA applicable to the Premises, a sum equal to (y) all Rent and other charges, payments, costs and expenses due from LESSEE to LESSOR and in arrears at the time of the default, plus (z) the Rent

19

reserved for the then entire unexpired balance of the Term of the SLA (taken without regard to any early termination of the Term), plus all other charges, payments, costs and expenses herein agreed to be paid by LESSEE up to the end of such Term which shall be capable of precise determination at the time of the default, less any amounts received or that LESSEE can prove would have been received by LESSOR's reasonable efforts to mitigate damages

(D.E. 53-4 at 8.) Plaintiff claims it is entitled to "$1,839,696, before interest." (D.E. 53-2 at 6.) Defendant failed to address Plaintiff's calculation of damages in its response to GTP's motion for summary judgment or in its own motion, instead alleging an issue of disputed fact as to mitigation. In order for the Court to properly evaluate the issue, the parties are hereby DIRECTED to submit briefs to the Court solely as to the issue of damages.

*Conclusion*

Based on the foregoing, Plaintiff's motion for summary judgment as to the claim of breach of contract is GRANTED. Defendant's motion for summary judgment as to the allegation of unjust enrichment is GRANTED, and that claim is DISMISSED. Further, the parties are DIRECTED to submit briefs to the Court within fifteen days of entry of this Order addressing the issue of damages.

IT IS SO ORDERED this 22nd day of December 2015.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE